1    JoAnn Corson Bacheller
     Registered Diplomate Reporter
2    Certified Realtime Reporter
     P. O. Box 8006
3    Missoula, Montana 59807-8006
     406/829-7123
4    406/542-7272
     joann_bacheller@mtd.uscourts.gov
5
     United States Court Reporter
6

7

8

9               IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MONTANA
10                     MISSOULA DIVISION

11   UNITED STATES OF AMERICA,    )   No. CR-12-36-M-DWM
                       Plaintiff,)
12        vs.                     )   **VOLUME 4 EXCERPT**
                                  )   **TRANSCRIPT OF JURY TRIAL**
13   CHRISTIN DIANNE DIDIER,      )
     and SURAYYA MAHASIN NASIR,   )   DEFENDANTS' MOTIONS FOR
14                    Defendants.)    RULE 29 JUDGMENTS OF ACQUITTAL
     _____)
15

16

17           BEFORE THE HONORABLE DONALD W. MOLLOY
             SENIOR UNITED STATES DISTRICT COURT JUDGE
                 FOR THE DISTRICT OF MONTANA
18

19            Russell Smith United States Courthouse
                       201 East Broadway
20                 Missoula, Montana 59802
                   Thursday, March 21, 2013
21                  09:42:14 to 13:16:48

22

23

24
                 Proceedings recorded by machine shorthand
25        Transcript produced by computer-assisted transcription

1                          **APPEARANCES**

2   For the Plaintiff:            MR. TIMOTHY J. RACICOT
                                  Assistant U.S. Attorney
3                                 P. O. Box 8329
                                  Missoula, Montana 59807
4
    For the Defendant Didier:     MR. COLIN M. STEPHENS
5                                 Attorney at Law
                                  315 West Pine
6                                 Missoula, Montana 59802

7   For the Defendant Nasir:      MR. MICHAEL DONAHOE
                                  Attorney at Law
8                                 P. O. Box 250
                                  Helena, Montana 59624
9

10                          **CONTENTS**

11  Requested Excerpt ......................................    3

12  Motion by Mr. Stephens .................................    3

13  Motion by Mr. Donahoe ..................................    4

14  Response by Mr. Racicot ................................   15

15  Reporter's Certificate .................................   24

16

17

18

19

20

21

22

23

24

25

1                          PROCEEDINGS

2        (Open court.)

3        (Defendants present.)

4        (Jury not present.)

5             THE COURT:  You can step down, Mr. Brunett.

6             Motions?

7             MR. STEPHENS:  Your Honor, at this point on behalf

8    of Ms. Didier, we would move for a judgment of acquittal

9    pursuant to Rule 29(a) of the rules of criminal procedure.

10            Just briefly, I don't believe the government has

11   presented sufficient evidence beyond a reasonable doubt that

12   Ms. Didier is guilty of the offenses charged in the

13   indictment.  Specifically, I'll just set forth a few.

14            Your Honor, I don't believe the government has

15   presented sufficient evidence that Ms. Didier could form a

16   specific intent to defraud in this particular case, given the

17   mental disease or defect under which she was suffering as we

18   heard from the doctor's testimony yesterday.

19            I think there's been insufficient evidence to show

20   that she could -- and I know Mr. Donahoe will probably address

21   this in more detail -- but enter into a conspiracy with

22   Ms. Nasir at this point, again addressing back to the mental

23   disease issue.

24            This one, Your Honor, the other element of the crime

25   is that the statements or misstatements be material.  I don't

1   think the government has presented evidence that the

2   statements were material in this sense.  I don't think anyone

3   has said, "Had she told us the real story, we would have paid

4   her any less."

5          I think Mr. Brunett just testified his understanding

6   was that 15 was the threshold; that was, "We weren't going to

7   go above that."  And there was nothing in the statement --

8   there was nothing in the policy that said she couldn't move

9   into a lesser residence, and the policy itself appears to be

10  completely silent on what happens with the monetary ceiling if

11  you move into something that's less than equivalent of what

12  you vacated.

13         Ms. Witte from ALE indicated that it was common for

14  people to do this; they just couldn't go through ALE to do it.

15  They had to go through their adjuster.  And I don't think that

16  at that point, given Ms. Didier's mental issues, that she

17  could even know that those statements were going to be

18  material based on the information she had.

19         So with those deficiencies in the government's case,

20  Your Honor, we would ask for a judgment of acquittal.

21         THE COURT:  All right.

22         Mr. Donahoe.

23         MR. DONAHOE:  Thank you, Your Honor.

24         Judge, in my opening statement, I made reference to

25  the jury about this line, and, you know, I tried to develop

1   that theme, and that people are on one side or the other side

2   of this line in this case, and that that line, I guess we

3   could characterize, is one of guilt or innocence.  And I'd

4   like Your Honor to think about that line under the terms of my

5   motion here under Rule 29 of the Federal Rules of Criminal

6   Procedure and the Supreme Court's decision in *Jackson v.*

7   *Virginia* and both the due process clauses and the Sixth

8   Amendment fair trial clause.

9          The government hasn't proved a conspiracy here.

10  There's insufficient evidence to go to the jury on this point.

11         The undisputed truth is that there were, depending

12  upon how you count, three events that Ms. Didier was involved

13  in:  A microburst windstorm that toppled the chimney and

14  ruined the roof of her Somers mansion in July of '07.  There

15  is no dispute about that.  There was a claim for damages and

16  to have that roof and that structure repaired.  I don't know

17  what the extent of all that damage was.  But then that led, at

18  some point in time, into the fall of '07 to a claim that that

19  windstorm had likewise caused damage to that boiler.

20         Now there is no evidence, and I mean none, zero,

21  zilch, that puts Ms. Nasir in the middle of that debate.  She

22  has nothing to do with the '07 windstorm.  She has nothing to

23  do with the boiler.

24         Now there is a fairly extensive controversy that's

25  developed in the evidence here where there's discussion of

1    whether the boiler was really part of the windstorm claim,

2    whether it was appropriate for Ms. Didier to make that claim

3    *post hoc* the event of the windstorm, and I guess the nub of it

4    is there's discussion about the insurance company saying,

5    "Leave the boiler alone.  We'll have it looked at, and we'll

6    give you some kind of estimate or analysis of what role, if

7    any, we're going to play in having that thing repaired or

8    replaced."

9           Now, contrary, at least according to the evidence

10   from the insurance company's point of view, that instruction

11   or directive is not followed, and, I think and point this out

12   for emphasis sake, this seems to be sort of a significant

13   turning point because it's the first real bone of contention.

14   There's really no other evidence insofar as the windstorm is

15   concerned about the legitimacy of that claim.  I think

16   everybody from Mr. Petersen to Mr. Brunett to other people

17   that may have worked on the claim were all in agreement that

18   the windstorm claim was a legitimate claim and fixing the roof

19   was a legitimate claim.

20          But there started to be anomalies around the time of

21   the boiler business because the insurance company, according

22   to the evidence, was learning, likewise, that there were

23   people involved that were either doing work, contractors,

24   Jeanne Bowman, people of that nature, and Ms. Didier was

25   making claims against her policy for work performed, services

1    rendered for vendors and so on, and it was starting to get out

2    of control a little bit.

3         There's not one iota of proof that Ms. Nasir has

4    anything to do with that.  Nothing.

5         Now that brings us to the fire, and there is

6    discussion about that.  I know Your Honor has listened

7    attentively to the proof, but just to sum it up, the

8    fireplaces are loaded up with wood.  Jeanne Bowman is pretty

9    accurate, I think, on that score.  It heats up those

10   floorboards to the point where there's concern on Bowman's

11   part that the fire department should be called.  The fire

12   department is called.  I asked the express question whether

13   Ms. Bowman thought she was trying to set the place on fire,

14   Ms. Didier.  Got a "No" answer to that, so there was no

15   problem there.

16        But, again, no involvement by Nasir.

17        Now the notes, which is Exhibit No. 7, Government's

18   Exhibit No. 7, I've read those notes a lot.  I know them

19   backwards and forwards, and they're kind of weird, but they

20   read from the bottom up.  Took me a long time to kind of get

21   used to that, but I've been through them, and if Your Honor

22   went through them, and I think the government would concede

23   this point, really the proof does track in sort of a

24   chronological way:  The claim is opened.  Ms. Didier is

25   described as a high-end client.  Mr. Petersen is the adjuster.

1   There are claims made, and we finally get to a point, and it's

2   reflected in the notes, that she's going to be moved out of

3   that mansion.

4        Ms. Nasir has nothing to do with any of that.

5   Ms. Nasir is not mentioned in any phase of that discussion in

6   those notes, those ALE notes.

7        So the decision is going to be made.  There are

8   houses discussed.  There's Property 1, Property 4, property

9   this, property that.  There's discussion in the notes -- those

10  notes are offered for their truth -- that says that the

11  property is going to be presented to the insured to see if she

12  wants to go live there.  There's one discussion that says,

13  "You know, we do have this property on tap.  It's kind of

14  pricey.  It's like 40K a month," and the adjuster puts the

15  kibosh on that.

16       So the point I'm trying to make here is that the

17  proof at this point shows that there's dialogue and

18  understandings between ALE, Didier, and the adjuster, and

19  they're going round and round, trying to figure out where to

20  put her.  She's got all these problems with the dogs.  The

21  dogs are mentioned.  She talks about furniture and Versace

22  rugs and all kinds of things.  Claims are made.

23       But, again, Nasir has absolutely nothing to do with

24  that.

25       Now prior to Nasir being mentioned, involved,

1    discussed, anything, there's a note in Exhibit 7 that says,

2    "Insured has located maybe her own property."  Something to

3    that effect.  So the instigator of this rental house business

4    is Ms. Didier.

5         Now I would like Your Honor, please, to bear -- just

6    if I could, if I could develop this idea that -- I want to

7    talk about Jeanne Bowman.  This might sound like from left

8    field, but I think there are similarities here, and it goes to

9    my reference to this guilt/innocence line.

10        Jeanne Bowman is a person who says, "You know, I did

11   some work around there.  I was a caretaker.  I kept house.  I

12   cleaned things.  After the storm," and I want to fixate kind

13   of on this particular point where she said, "I even helped

14   clean up the bricks."

15        "Well, were there a lot of bricks?"

16        "No, not that many."

17        "Did you do it by yourself?"

18        "Yeah, from my memory."

19        "And what did you do?"

20        "Well, I got them up out of the driveway.  I stacked

21   them up."

22        "How long did that take?"

23        "A couple hours."  I think that's what the proof

24   would show, the transcript would show.

25        And then, though, we have Brunett talking about

1    money that's claimed for Jeanne Bowman somewhere in the nature

2    of $10,000 for work and services performed, and Brunett has an

3    understanding that Didier is asking for that money, and Bowman

4    is telling the Court at the beginning of the case and the jury

5    at the beginning of the case that, "You know, it just didn't

6    amount to that much."

7            Now I submit that Jeanne Bowman and Ms. Nasir are

8    almost in the same kind of position in this case, because

9    Ms. Didier will use people as tools to justify illegitimate

10   claims, and that's the point here, is to maximize the take

11   under the policy.  She will use distorted interpretations,

12   misunderstandings.  She uses inconsistent statements.  She

13   does all manner of prevarication in the bankruptcy court, in

14   the property descriptions.  She's just doing it time and

15   again.

16           Now with that background, enter Ms. Nasir.

17           Ms. Nasir is called, under the terms of the proof,

18   on the telephone.  "Please help me."

19           Now this little piece I did with Mr. Brunett,

20   "What's their association?"  They met in a previous life.

21   They shared some time together as stewardesses.  They were

22   roommates for a bit.  Ms. Nasir went to real estate school.

23   Ms. Didier came back to Montana.  And I think that's the gist

24   of it.  But she knows, Ms. Didier, that Ms. Nasir is in a

25   foreign state, in a distant state, and she calls her and says,

1    "Boy, I could use some help."

2              There is no question that Nasir becomes involved

3    with ALE Solutions.  Kris Witte says that.  The proof

4    categorically states at this point that ALE Solutions knew, on

5    January 31 of 2008, at a minimum, if not before, that the

6    Didier Trust was going to be the renter of the property.

7              The proof categorically states, without

8    contradiction, according to Kris Witte, that Ms. Witte had a

9    concern that the Didier Trust had the same name as the Didier

10   renter, being Ms. Didier, the defendant in this case, and she

11   was maybe going to rent her own property.  And I crossed

12   Ms. Witte about that and established beyond a reasonable doubt

13   that Ms. Didier had a private, segregated conversation with

14   Ms. Witte about the ownership interest in that property, and,

15   according to Ms. Witte, the ownership interest was disclaimed.

16             And after that, it was paperwork, Your Honor.

17   That's all it was.  It was paperwork.  It was a lease, a form

18   lease, and forms that had to be filled out.  It was nothing

19   beyond that.  It may look like it's something beyond that,

20   but, in reality, it is absolutely nothing more than that.

21             And there's no proof in this record to show that

22   there was prior complicity on Ms. Nasir's part to engage in

23   this transaction.  It's simply something that Ms. Didier

24   contrived to involve another person, to put another buffer

25   between herself and entities that she had to do business with.

1          And I respectfully submit that this fee that was

2     calculated and put on that schedule in the first instance,

3     although testified to as sort of a routine thing, at least by

4     one of the first witnesses, Sara -- begins with an M.  Her

5     name escapes me.  But she said that generally the fee can be

6     the first month's rent, and this was less than that, that

7     $10,000 fee.

8          But I would make an argument to the Court that in

9     terms of intention, that number was put in there along with

10    the $12,000 deposit, the cleaning deposit, the pet deposit,

11    whatever other deposits were in there, to inflate that figure

12    to make the size of that check bigger; and that there was

13    maybe an expectation, although not a certainty, that

14    Ms. Didier would get all of that money and have it at her

15    disposal, and she was just waylaid a little bit that there

16    were separate checks cut for the commission and for the other.

17         So my point being that Nasir was always intended to

18    be a Jeanne Bowman.  She was going to be used as a tool,

19    perform some work and not receive any benefit.  That was the

20    expectation.  And on the slim record that Ms. Nasir received

21    the compensation and nothing more, it's too flimsy.

22         Now there has been a lot of discussion about the

23    versions of the lease, and I want to address that.

24         I think it is established beyond a reasonable doubt

25    that the three people that were involved in shuffling and

1   transmitting these papers were all in different jurisdictions.

2   They were all in different states.  They all had fax machines.

3   They were all faxing to one another.  To this day, I've looked

4   at these documents, I don't know, 500 times.  I cannot

5   determine to my own satisfaction who sent what to who, when.

6   I just can't do it.

7        And I submit respectfully to Your Honor the

8   government hasn't proved it, either.  There isn't anything, in

9   terms of the burden of persuasion being fulfilled, that

10  Paper A was faxed to Ms. Nasir first and then faxed on to

11  Ms. Didier, and that Ms. Didier filled it out, and then

12  Ms. Didier sent it back to Ms. Na- -- there is nothing of that

13  nature in that record.  The best that we can do is that people

14  have fax machines; they're faxing, they're signing things and

15  faxing; and then the document that they fax stays with them.

16       Mr. Markey talked about, "I've always been trying to

17  find the original."  Well, of course you can't find the

18  original.  There is no original.  They're all fax copies.  And

19  everybody would likely wind up with something different

20  because three people have to sign it in three different

21  jurisdictions.

22       Now so that's a red herring in this case, the

23  versions theory and the originals theory, like somebody is

24  doing something untoward.  There's just nothing of a

25  satisfactory nature to prove who sent what to who, when.

1         Now that said, what do we know about alteration of

2    documents?  We know from the record in this case that right

3    after this transaction went down for this rental property,

4    Ms. Didier turned around, altered those rental documents, at

5    least according to Mr. Markey, and filed them in an altered

6    condition in her bankruptcy case to show that she was

7    receiving income.

8         Ms. Nasir had nothing to do with any of that, and

9    it's not proof as to her.

10        So the long and the short of this is I don't make a

11   judgment about the specific intent issue.  On that score, I

12   would respectfully submit that Your Honor, with the Court's

13   indulgence, took the proof out of order, so probably the

14   doctor's proof isn't something -- I don't know.  Maybe that's

15   a technical question -- that should be considered in the

16   context of this Rule 29.

17        And I don't mean to disparage or condemn Ms. Didier.

18   I know I'm talking in forceful language here.  And I'm not

19   making a moral judgment.  It's entirely conceivable under the

20   doctor's testimony that this woman is suffering from some kind

21   of ailment, that these prevarications and distortions are a

22   product of the confabulation that I crossed that doctor on

23   yesterday.  That seems to me to be a very appropriate and

24   compelling argument here.

25        But that would be my final point.  If that is the

1    case, there is absolutely no way that this woman, Ms. Nasir,

2    could reach a meeting of the minds to enter into a conspiracy

3    with Ms. Didier.

4           And based on the totality of this evidence, the case

5    shouldn't go to the jury for Ms. Nasir.  She should be

6    dismissed out and be dismissed out now.

7           Thank you, Your Honor.

8           THE COURT:  All right.

9           Mr. Racicot, how long do you think you'll be?

10          MR. RACICOT:  Judge, I'll try to be about two

11   minutes without driving Ms. Bacheller crazy, because I know

12   we're on the clock here.

13          THE COURT:  Well, and I don't want to cut you off,

14   because I think that Mr. Donahoe raises some concerns that I

15   have.  The conspiracy, I think you're pretty short on proof on

16   that, and so I don't want to cut you off on time because I

17   know you know the record.  So.

18          MR. RACICOT:  Certainly.  No, I appreciate it, and

19   you know the record, too.  I know -- I've done enough trials

20   with you.  I know you pay close attention to what comes in, so

21   I won't belabor the proof.  I think most of what Mr. Donahoe

22   characterized in terms of the evidence is accurate as far as

23   it relates to my recollection as well.

24          First of all, as you know, the standard is whether

25   essentially any rational juror can find Ms. Didier and/or

1    Ms. Nasir guilty, viewing the evidence that's been introduced

2    to this point in a light most favorable to the government.  So

3    that's where we're starting off.

4         Now I'm going to jump right into Mr. Donahoe's

5    concerns, and he mentions the wind issue, the windstorm, and

6    the boiler and that Ms. Nasir has no involvement in any of

7    that, and he's right.  It's simply a matter of timing.  In

8    fact, the only real relevance to that evidence at all is as it

9    goes to Ms. Didier's intent and whether or not she can form

10   intent.  So I don't think those issues are in play so much as

11   it relates to the direct crux of the charges.  There are no

12   charges that relate to the wind claim directly or the boiler

13   directly, so that's really sort of a red herring on his part.

14        He mentions that Jeanne Bowman is in the same camp

15   as his client, but he established on cross-examination that

16   Jeanne Bowman did not get paid for anything and his client

17   did, and now he says, "Well, maybe that was an oversight.

18   Maybe that's just because ALE cut two checks, and, if they

19   would have cut one, Ms. Nasir never would have gotten her

20   money."  I don't know, but she did get it, and she

21   acknowledges in one of the interviews that she did get it.

22        Ms. Witte, I believe her testimony was that her

23   recollection was that both Ms. Didier and Ms. Nasir told her

24   that Ms. Didier had no ownership interest in that property.

25   She specifically recalled the context surrounding the

16

1   conversation with Ms. Didier, but I believe she said that her

2   recollection was she believed she spoke to both of them about

3   that.  And that, to the extent that Ms. Witte's memory is not

4   accurate about that, that should be an assessment that the

5   jury ultimately makes, as long as there's enough evidence to

6   submit it to them in the first place.

7         And then we have Ms. Nasir's statements to

8   Mr. Markey and Mr. Brunett.  And I think Mr. Donahoe went to

9   pains to try and elaborate on the statement to Mr. Markey, to

10   try and put it in the perspective that he wants it to be

11   viewed in, and I understand that.  And the reason for that is

12   it's pretty damning evidence against his client, because his

13   client says to Mr. Markey, "ALE knew that that was

14   Ms. Didier's property, and they knew that when they entered

15   the lease."

16         I believe she also says, according to Mr. Markey, "I

17   knew that that was Ms. Didier's property, and I knew that when

18   we entered into the lease."  Now that's important evidence,

19   and, frankly, that evidence, by itself, is enough for a

20   rational juror to conclude that she's involved.

21         THE COURT:  Well, but how does it fit in the

22   chronology where that was all known?  And if you take

23   Exhibit 7, all of that stuff was known before there was any

24   kind of check cut.

25         MR. RACICOT:  No, not -- no, that's -- Kris Witte

1    said, "We didn't know that.  If I would have known, when I
2    called Ms. Didier, if she'd said, 'Yes, you're right.  It's my
3    property.  It's my trust,'" that Ms. Witte would have said,
4    "We're out, then.  Whether or not Chubb will pay you that
5    money is up to Chubb, but we're out.  ALE Solutions does not
6    stay involved if you're renting your own property."

7           And she said -- I said, "What if she would have
8    said, 'Bag it.  I'm going to my own cabin'"?  She said that
9    would have been between she and Chubb, and she doesn't know
10   what Chubb would or wouldn't pay.

11          But Scott Petersen said, "It totally depends.  Are
12   you kicking people out of your property?  Do you have to do
13   this and that to get into the property?  Turn it on because
14   it's been closed down for the winter?  Maybe we'll pay for
15   that."  But that totally depends on what Chubb knows at the
16   time.  Neither Chubb nor ALE knew that at the time, and I
17   think that, in and of itself, Judge, is enough to send it to
18   the jury.

19          And then I think the jury is entitled to consider
20   Ms. Nasir's statements and her demeanor with Mr. Markey and
21   with Mr. Brunett.  She keeps saying, "I'll get the file.  I'll
22   get the file.  I'll get the file."  And I'll be clear in
23   closing:  She doesn't have a burden to do anything in this
24   arena.  She doesn't have a burden to do anything in that
25   arena, either, but she keeps saying that she will, and I think

1   the jury is entitled to consider that as it relates to whether

2   or not there's something she doesn't want them to know,

3   whether or not this is a train she doesn't want to get on at

4   the station but wants to try and stay out in front of.  I

5   think those are considerations that they're entitled to make.

6          THE COURT:  All right.  Well, I have another

7   question for you.

8          MR. RACICOT:  Yes, sir.

9          THE COURT:  And this goes to the very heart of your

10  case and to the proof as I listened to it from Mr. Petersen,

11  from the last testimony from Mr. Brunett, from the interview

12  statement with Ms. Didier where she made a statement, and it

13  goes to the point that Mr. Stephens makes about materiality.

14         The obligation of Chubb, and I wrote it down, was

15  that if you cannot -- if your house cannot be lived in, and

16  then there's some language, it will be covered to maintain

17  your household's usual standard of living.  There's nothing in

18  that policy that says anything about she can't live in her own

19  property and they're contractually obligated to pay her no

20  more than $15,000 a month, according to Mr. Petersen.

21         And there was reference that Chubb is a good policy

22  for high-end things because they're liberal in what they

23  require, liberal in what they pay, liberal in what they expect

24  from the insured.  And the testimony, consistent testimony

25  throughout, from every witness that testified on it, was that

19

1  with that policy, they had to pay her for comparable value for

2  the Somers mansion.

3          Now in her interview, she made the point of saying,

4  "You mean to tell me that if the floor is ruined and I want to

5  put in linoleum, you don't have to pay me the replacement

6  value?"

7          And my question is:  What representation was

8  material to anything that the insurance company wasn't

9  obligated to pay in the first instance?  They had to pay

10  $15,000 a month.

11          MR. RACICOT:  I, I would strongly disagree with

12  that, Judge.  Neil Brunett said that.  He also said he didn't

13  look at the policy, so that was his understanding, is that

14  $15,000 was the cap.

15          But Scott Peter- -- and the dollar-store-linoleum

16  discussion, Ms. Didier is reporting that Ms. Witte told her

17  that.  Who knows if that even occurred.  But even if it did,

18  Scott Petersen said, "No.  The loss has to be incurred.  It

19  has to be an incurred loss.  If you have to leave your home,

20  we will do the best we can to find you something comparable."

21  I mean, why was everybody looking for comparable properties if

22  it didn't matter where she went and they just had to cut her a

23  check anyway?

24          THE COURT:  I know.

25          MR. RACICOT:  They would have just cut her a check.

20

1          THE COURT:  But their obligation is to pay.

2          MR. RACICOT:  For something that she incurs.  I

3   mean, that was Mr. Petersen's testimony.

4          THE COURT:  No.  To pay her standard of living.

5   That's what they obligated contractually to pay, to keep you

6   at your standard of living.  It doesn't say to keep you in a

7   20-bedroom mansion that's got 10,000 square feet.  That isn't

8   what it says.  It says to keep your standard of living.  And

9   so if she's flying around, getting frustrated, or whatever

10  she's doing, and they don't approve a $40,000-a-month place in

11  Whitefish, which seems relatively reasonable to me, but they

12  still have to pay her $15,000, or $10,000 to $15,000, they

13  have to pay that.

14         MR. RACICOT:  He says in that note in ALE, the ALE

15  note is from -- it's a representation that he makes when he

16  rejects the $40,000, and he says, "Try to keep it around 10 to

17  15."  There was never any firm number.  It was all

18  conditioned, as he said, on whether she actually had to go

19  somewhere.

20         THE COURT:  Well, but that's not what the policy

21  says.

22         MR. RACICOT:  That's, that's -- it says reasonable

23  increase in your expenses.  If she said to him, "I want to

24  stay right where I am," then they would have maybe given her

25  the $50,000 that she had to deal with for costs associated

1   with staying there, but they wouldn't have paid anything to go

2   somewhere else if you weren't actually going somewhere else.

3          THE COURT:  Boy, I don't know.  I think you've got

4   issues with materiality on any representations that were made.

5   I, I --

6          MR. RACICOT:  Well, I --

7          THE COURT:  It's really troubling to me that an

8   insurance company takes a high-end premium and agrees to pay

9   to keep somebody's standard of living, and they make a

10  determination that's between $10,000 and $15,000 a month, and

11  Petersen testified it's based on what you are leaving, not

12  what you are going to.

13         MR. RACICOT:  Yeah, but if you are leaving.

14         THE COURT:  Well, she left the house.

15         MR. RACICOT:  And that's why they're looking for

16  something comparable, someplace comparable for her to go.

17         THE COURT:  But the pay is based on what she left,

18  not on where she goes.  The standard of living is the measure.

19  It doesn't say anything about, "We'll pay only actually

20  incurred rent costs."  It says, "We'll pay your standard of

21  living based on what you were living in."

22         MR. RACICOT:  Well, I guess, then, I would argue

23  that the jury is entitled to make a determination of the

24  language in the policy --

25         THE COURT:  Well, that may be your best argument --

22

1           MR. RACICOT:  -- versus Mr. Petersen's testimony.

2           THE COURT:  -- but I am, I am very troubled by it.

3    And I didn't want to cut you off.

4           MR. RACICOT:  No, that's all right.  I've said what

5    I need to, I think.

6           THE COURT:  All right.  Well, we'll be in recess

7    until 1:15.

8           And would you please, unfortunately, clean up your

9    area there so that we can -- I see people gathering outside

10   right now for the naturalization.

11       (Recess taken from 10:13:07 to 13:16:20.)

12       (Open court.)

13       (Defendants present.)

14       (Jury not present.)

15          THE COURT:  Be seated, please.

16          All right.  I'm going to take the Rule 29 motion

17   under advisement because I think there might be some merit to

18   Mr. Donahoe's argument as it relates to Ms. Nasir, but I, I am

19   not yet convinced that I shouldn't submit the case to the

20   jury.

21       (End of requested excerpt, 13:16:48.)

22

23

24

25

1                    REPORTER'S CERTIFICATE

2          I, JoAnn Corson Bacheller, a Registered Diplomate

3   Reporter and Certified Realtime Reporter, certify that the

4   foregoing transcript is a true and correct record of the

5   proceedings given at the time and place hereinbefore

6   mentioned; that the proceedings were reported by me in machine

7   shorthand and thereafter reduced to typewriting using

8   computer-assisted transcription; that after being reduced to

9   typewriting, a certified copy of this transcript will be filed

10  electronically with the Court.

11         I further certify that I am not attorney for, nor

12  employed by, nor related to any of the parties or attorneys to

13  this action, nor financially interested in this action.

14         IN WITNESS WHEREOF, I have set my hand at Missoula,

15  Montana this 1st day of April, 2013.

16

17                              /s/ JoAnn Corson Bacheller
                                _____
18                              JoAnn Corson Bacheller
                                United States Court Reporter
19

20

21

22

23

24

25