Colin M. Stephens
SMITH & STEPHENS, P.C.
315 W. Pine
Missoula, MT 59802
Phone: (406) 721-0300
Fax: (406) 721-5370
colin@smithstephens.com

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>vs.<br><br>CHRISTIN DIANNE DIDIER, and SURAYYA MAHASIN NASIR,<br><br>Defendant. | CR 12-36-M-DWM<br><br>DEFENDANT DIDIER'S BRIEF IN SUPPORT OF OPPOSED RULE 29 MOTION |

**BRIEF IN SUPPORT**

*Introduction*

Christin Dianne Didier (Didier) was convicted by a jury after a five-day trial. At the conclusion of the Government's case, counsel for both defendants made their respective requests for judgments of acquittal pursuant to Rule 29(a). During the brief hearing, the Court expressed serious concerns about the Government's ability to prove the element of materiality. However, the Court reserved ruling on the motions. The jury returned verdicts of guilty on all counts of the Indictment against both Didier and Nasir. Dider now stands convicted of seven counts of mail fraud and one count of conspiracy to commit mail fraud. (Dkt. No. 98).

Despite this conviction, Didier now moves this Court for a Judgment of Acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure on the

grounds that a reasonable jury, even viewing the evidence in a light most favorable to the Government, would not have found Didier guilty given her mental issues and the insufficiency of the evidence on materiality.

*Argument*

I. Standard of Review

In reviewing a Rule 29 motion, this Court must view the evidence in a light most favorable to the Government. "Viewing the evidence in the light most favorable to the prosecution [requires a court] to 'presume . . . that the trier of fact resolved any . . . conflict[ing inferences] in favor of the prosecution.'" *United States v. Flores Rosales*, 516 F.3d 749, 752 (9th Cir. 2008) (quoting and citing *United States v. Johnson*, 229 F.3d 891, 894 (9th Cir. 2000). In reviewing the evidence in the light most favorable to the Government, this Court must determine "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ruiz-Lopez*, 234 F.3d 445, 447-48 (9th Cir. 2000).

Despite this seemingly insurmountable standard, it remains possible for this Court to enter a judgment of acquittal in spite of the jury's verdict. As one commentator has said, "All of the provisions of [Rule 29] provide a safety valve for those situations in which the court believes that there is insufficient evidence to support a guilty verdict against the defendant." Laurie L. Levenson, *Federal Criminal Rules Handbook*, pg. 353 (West 2012).

II. Discussion re: Materiality

The jury in this case was properly instructed on the elements of mail fraud, a specific intent crime. (Instruction No. 13). Among those elements was a requirement that the Government prove beyond a reasonable doubt that Didier's statements or omissions were "material." The jury was instructed that, simply because a statement is false or misleading, does not automatically make it material. (Instruction No. 15). Rather, the statement or omission must have been of such

importance it could reasonably be expected to cause or induce Chubb Insurance to increase the disbursement above what would have been due under the insurance policy.

Crucial to the question of whether a rational juror could have found that Didier's statements[1] were material beyond a reasonable doubt is the distinction between Chubb Insurance and ALE. The Government's allegations were that Didier defrauded Chubb, not ALE. The testimony of employees of ALE were largely irrelevant to the issue of materiality. Any testimony relating to this specific issue could only have come from Scott Petersen, the adjuster for Chubb Insurance. Mr. Markey, the fraud investigator from Chubb, was only called to assist after the allegations of fraud occurred, and Didier had already began collecting the payments on the cabin.

To counsel's knowledge or recollection, there was no direct testimony from Mr. Petersen that Chubb would have paid Didier less under the policy had she been forthright about the physical condition or ownership of the cabin. Witnesses presented testimony that Mr. Petersen reduced the equivalency range for the Somer's Mansion from approximately $40,000.00 and asked ALE to look for location between $10,000.00 and $15,000.00. However, no one testified that Chubb would have reduced its payments to an amount representing the actual worth of the cabin had Didier described the cabin accurately. Absent such testimony, there is no evidence that Didier's statements were material to the amount of money Chubb would have had to pay out under the relevant, vague terms of the policy.

This Court concluded as a matter of law the "Extra Coverages, Additional Living Expenses provision of the Chubb Insurance Policy is ambiguous." As a

[1] For the simplicity, the term "statements" is used to included both statements and omissions.

result, the Court instructed the jury it must "construe [the provision] liberally, in a manner most favorable to . . . Ms. Didier, and strictly against the insured." (Instruction No. 16). The vague term reads as follows:

> If your house cannot be lived in because of a covered loss to your house or, if applicable, your contents, we cover the reasonable increase *in your normal living expenses that is necessary to maintain your household's usual standard of living.* We cover this increase for the reasonable amount of time required to repair, replace or rebuild your house or your contents, or if you permanently relocate, the shortest amount of time required for your household to settle elsewhere. This period is not limited by the expiration of this policy.

(Government's Exhibit 38). Nothing in this provision of the policy indicates that the amount of compensation paid by Chubb is based on the location to which Didier moved; rather, the emphasized language suggests the compensation for additional living expenses is based on the "normal standard of living" and maintaining "the usual standard of living." Thus, if Didier's normal and usual standard of living involved living in a large mansion, that is the basis for calculating the additional living expense. Nothing in the case presented by the Government refuted this aspect of the policy. The Government called no witnesses to explain this policy or to clarify why Didier's statements were material to the calculation of her "normal standard of living." No such testimony came from Mr. Petersen. Further, the testimony of ALE employees, especially that of Ms. Whitte, indicated ALE is not involved in calculating the amount to be paid under the Additional Living Expenses. In fact, Ms. Whitte testified she had no contact with Mr. Petersen at all. Didier's statements were certainly not material to ALE, and the Government did not prove beyond a reasonable doubt that the statements were material to Chubb to the extent that an accurate description of the cabin would have resulted in an adjustment of Didier's "normal living expenses"

or her "usual standard of living."[2]

The terms "normal living expenses" or "usual standard of living" are not defined in Chubb policy despite their frequent use. The terms are used again in the "Additional Living Expenses" section under the provision for "Forced Evacuation Expenses."

> If *your house* cannot be lived in because a civil authority prohibits you from using it, we cover reasonable increase in your normal standard of living expenses that is necessary to maintain your household's usual standard of living.

(Government's Exhibit 38). The policy is entirely silent on what happens if the insured elects to decrease her standard of living. The testimony presented by the Government was equally silent on the issue. Given the dearth of testimony on whether Didier's statements would have had a material effect on the amount of money Chubb was obligated to pay under the policy, no reasonable juror could have found the Government had satisfied this element of the offense of mail fraud beyond a reasonable doubt.

The only testimony presented at trial relating to the a determination of Didier's "normal standard of living" or her "usual living expense" was in relation to a location found by ALE, would have been far in excess of the Somers Mansion. Both Scott Petersen and Ms. Whitte testified Scott Petersen limited ALE's search criteria to locations between $10,000.00 to $15,000.00 per month. There was no testimony presented that, had Dider's cabin been valued at $300.00 per month, then Chubb only would have paid that amount. Again, the actual value of the cabin or a monthly rental payment on the value of the cabin was immaterial to the amount Chubb had committed to compensate Dider for her "usual standard of living." Any statement misrepresenting the state of the cabin was immaterial to

---

[2] Language almost identical to the language in Didier's policy became the subject of litigation in *Strauss v. Chubb Indem. Ins. Co.,* 2013 U.S. Dist. LEXIS 224 (E. Dist. Wis. 2013).

what Chubb, through Scott Petersen, had committed itself to pay.

If, then, Didier's statements regarding the cabin's physical description are not material, the only remaining material issue is the ownership of the cabin. Again, the evidence presented at trial is insufficient to establish materiality beyond a reasonable doubt. Like the cabin's description, the testimony relating to the materiality of the cabin's ownership could only come from Scott Petersen. Ms. Whitte testified the ownership of the cabin would be material to ALE but only in the sense that she would have directed Didier to address the issue with the insurance company and not ALE. In that sense, Dider's statements were not material within the context of the jury instructions, i.e., relating to the amount of money disbursed by Chubb.

The testimony of Scott Petersen did not establish that Chubb would have given a greater or lesser amount of money to Didier had it known Didier Trust was an entity solely controlled by Didier herself. The Government could very well have called witnesses to establish such a claim but did not. The only representative from Chubb to testify about the potential materiality of the issues was Scott Petersen. Again, Mr. Markey's involvement in the case did not arise until long after the fact. According to the Notes & History complied by ALE, Mr. Petersen was not even involved in the decision to approve the cabin. On January 29, 2008, Petersen sent an email to Leslie Mowers (who did not testify at trial) indicating Petersen had received a voice mail from Mowers. Petersen indicated he did not "understand the terms/costs" from a message Mowers had left for him. He requested a note from Mowers "detailing what Ms. Didier is proposing." Petersen requested Mowers copy his supervisor, Kelly Lewis because he would be out of the office. (Government's Ex 7).

The next day, Mowers made an entry into the ALE records indicating that she had spoken to Kelly Lewis who informed Mowers to "go ahead and proceed" with the cabin property. (Id). This approval was codified in an email from Kelly

Lewis to Mowers and copied to Petersen, which read simply, "As we discussed, okay to proceed with this property." (Id.). There is not evidence that the ownership of the cabin was material to Kelly Lewis, who ultimately approved the property for Chubb. Obviously, Petersen could not testify – and did not testify – that the ownership was material to Kelly Lewis. In fact, apparently, the Trust was of such little importance to Petersen/Chubb/Lewis that no one ever asked to view the document itself.

Given these circumstances and the absence of any testimony from Scott Petersen that Didier's ownership of the cabin was material to the amount of compensation she would have received from Chubb, no rational trier of fact could have found the Government could have proven materiality on this issue beyond a reasonable doubt. To the contrary, Ms. Witte testified it was not uncommon for individuals to live in their own accommodations. She merely stated, were that the case, ALE would have stepped aside and the matter would have been for Didier and Petersen to resolve; nothing in the evidence presented at trial proves beyond a reasonable doubt that it would have resolved itself any differently as to the amount of compensation due Didier.

Again, the distinction between what was material to ALE and what was material to Chubb became confusing at trial. There was a great deal of evidence presented that Didier's statements were material to ALE, but she was not charged with defrauding ALE; she was charged with defrauding Chubb. There was no evidence that Didier's statements were material to Chubb. Therefore, no rational jury could have found the Government presented sufficient to satisfy this crucial and necessary element beyond a reasonable doubt.

III. Discussion re: Intent to Defraud

The second crucial element at issue in Didier's trial was whether the Government could prove beyond a reasonable doubt that Didier acted with an intent to defraud; that is, the intent to deceive or cheat. (Instruction No. 13). The

testimony of doctors Beljan and Hipskind conclusively demonstrated Didier suffers from significant mental impairment due to carbon monoxide poisoning. However, even if the jury disregarded that testimony, the evidence at trial did not satisfy the Government's burden on intent beyond a reasonable doubt. The question of whether Didier possessed an intent to deceive or cheat again becomes a question relating to the insurance policy and what amount of compensation to which she was entitled under the vague terms of that policy.

The Government presented no evidence at trial that anyone from Chubb or ALE told Didier that she would not get compensated if she lived in the cabin. What was conveyed to Didier, however, was that she could either live in a motel for $500.00 per night.[3] There was some question whether the exact range conveyed by Scott Petersen to ALE of $10,000.00 to $15,000.00 was conveyed to Didier, but even if it was not, the evidence is undisputed that the rental amount for the cabin was remarkably close to that range. It was also undisputed that Chubb agreed to the rental price despite the fact it was slightly in excess of the top-end $15,000.00 range.

Mail fraud requires the Government to prove a specific intent to defraud, i.e. a specific intent to deceive or cheat. Given the evidence at trial, the Government did not prove Didier had the specific intent to defraud at the time the crime was alleged to have been committed. As demonstrated by the Government, Didier believed the Trust was an entity separate from herself. It took a court order from Judge Kirscher to conclude the Trust document was invalid under Montana law. (Government's Ex. 19). This Order was not dated until March 5, 2010 – long after Didier had represented to Chubb that the cabin was owned by the Trust, which was a separate entity. That Didier believed the Trust was a valid, separate legal

[3] A motel room at $500 per night multiplied over 30 days is exactly $15,000.00 per month.

entity as late at 2010, shows she lacked a specific intent to deceive Chubb over the true ownership of the cabin.

The issue of Didier's specific intent and the issue of materiality converge on the ownership of the cabin. The Government's testimony and evidence presented at trial did not prove Didier's actual ownership of the cabin was material to Chubb. Similarly, an analysis of materiality requires the Government to "prove beyond a reasonable doubt the fact misstated or the fact omitted was of such importance that it could reasonably be expected to cause or induce a person or organization to increase the disbursement provided above what would have been due under the policy." (Instruction No. 15). Again, Didier was informed that Chubb authorized her to live in a motel at $500.00 per night. No evidence was presented at trial that anyone, be they from Chubb or ALE, told Didier the disbursement provided was contingent on who or what owned the property into which she moved. Absent such a statement or representation to Didier, it cannot be proven beyond a reasonable doubt that she had a specific intent to defraud based on the statements she made regarding the Trust and the ownership of the cabin.

Didier's statements regarding the physical description of the cabin also lack evidence of a specific intent to defraud. Taken in the context of what information Didier had from both ALE and Chubb, she had been restricted from residing in a location that would have been $40,000.00 a month but authorized to live in a motel for $500.00 per day. Also, given the brain damage from which Didier was suffering at the time, the Government was unable to prove she had a specific intent to make materially false statements to Chubb beyond a reasonable doubt.

<u>III. Discussion re: Conspiracy</u>

Given the absence of evidence relating to the elements of materiality and intent to defraud as to the substantive charges of mail fraud, the Government's case fares no better on the Conspiracy charge. The evidence presented at trial did

not prove Nasir and Didier had agreed to commit one or more crimes. If the Government was unable to prove Didier had the requisite intent to defraud Chubb, it could not logically prove that Didier and Nasir had formed an agreement to do something unlawful. Additionally, the Government presented no evident that either Didier or Nasir knew that the statements made to ALE or Chubb were material.

As such, no reasonable jury could have concluded Didier and Nasir conspired to commit the offense of Conspiracy to commit mail fraud.

## CONCLUSION

While the grant of a Rule 29 Motion is an unusual grant after a jury verdict of guilty, Didier's case was unusual. There were a large number of individuals involved, the dollar amounts were extremely high, and the notes from the jury were highly unusual in not incomprehensible. Given these circumstances and the lack of evidence presented by the Government relating to the issues of materiality and Didier's specific intent, a judgment of acquittal is appropriate here.

Respectfully submitted this 5th day of April, 2013.

/s/ Colin M. Stephens
Colin M. Stephens
SMITH & STEPHENS, P.C.
Attorney for Didier

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Criminal Rule CR 12.1, I hereby certify that this Brief in Support of Opposed Rule 29 Motion complies with all requirement set forth in CR 12.1 in that it:

1. does not exceed 6,500 words. Total words are 3161
2. is double spaced in a proportionally spaced font;
3. is prepared in a 14 point Times New Roman font.

Respectfully submitted this 5th day of April, 2013.

/s/ Colin M. Stephens
Colin M. Stephens
SMITH & STEPHENS, P.C.
Attorney for Didier

**CERTIFICATE OF SERVICE**

I, Colin M. Stephens, do hereby certify that I delivered a true and correct copy of this Brief in Support of Rule 29(c) Motion to the following individuals via the means indicated.

Timothy J. Racicot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . CM/ECF
Assistant Attorney General

Michael Donahoe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . CM/ECF
Senior Litigator
Federal Defenders of Montana

Dated this 5th day of April, 2013.

/s/ Colin M. Stephens
Colin M. Stephens
SMITH & STEPHENS, P.C.
Attorney for Didier